DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, in which the trial court granted the parties a divorce and determined and distributed the marital assets.
 {¶ 2} On appeal appellant, Dale F. Quigley, sets forth the following four assignments of error:
 {¶ 3} "I. Whether the trial court committed an abuse of discretion when it awarded the Appellee an excessive distribution of the marital property in lieu of spousal support.
 {¶ 4} "II. Whether the trial court abused its discretion when it failed to divide marital property equally as required pursuant to R.C. 3105.171.
 {¶ 5} "III. Whether the trial court committed an abuse of discretion when it determined that the Appellee was permanently disabled and therefore unable to return to work without expert medical evidence.
 {¶ 6} "IV. Whether the trial court committed abuse of discretion when it did not require the valuation of Appellee's pension in order to make an equitable distribution of the parties' marital property."
 {¶ 7} Dale Quigley and appellee, Diana Quigley, were married on July 25, 1988. No children were born as issue of the marriage. At the time of the marriage, Dale was 43 years old and Diana was 38 years old. Initially, both parties were employed by Chrysler Jeep; however, Dale became employed by Ford Motor Company in 1989 as a tool and die maker. Diana quit work and began receiving social security benefits and disability payments from Chrysler in 2000.
 {¶ 8} On January 25, 2002, the parties had a domestic dispute, after which Dale left the marital home. On January 29, 2002, Dale filed a complaint for divorce. On February 11, 2002, Diana filed an answer and counterclaim for divorce.
 {¶ 9} After the parties separated, Diana discovered counterfeit money, credit cards and several fake driver's licenses issued under different names, all with Dale's picture on them. Diana contacted the police, who came and searched the house. As a result of the police search, illegal firearms and silencers were discovered among Dale's possessions. Dale was subsequently arrested and held in jail pending a trial on weapons charges.
 {¶ 10} While he was awaiting trial, Dale arranged to have Diana killed so that she could not testify against him. Eventually, Dale's plan was exposed, and he was charged with conspiracy to commit murder. He was later convicted of both weapons and conspiracy charges and was imprisoned in the federal penitentiary in Milan, Michigan for ten years.
 {¶ 11} On February 4 and 5, 2003, a divorce hearing was held. At that time, the trial court dismissed Dale's divorce complaint for lack of prosecution due to his incarcerated status. The matter then proceeded on Diana's counter-complaint.
 {¶ 12} Although both parties were represented by counsel, Diana was the only witness to testify at the divorce hearing.
 {¶ 13} Diana, who was 53 years old at the time of the hearing, testified that she has been totally disabled since October 2000, due to rheumatoid arthritis and osteoporosis. Diana testified that sometimes she is unable to walk or use her hands due to illness, and that she is on several types of medication. Diana stated that she believed her health would improve if she could move to a warmer climate.
 {¶ 14} Diana stated that she receives $1,350 per month in social security benefits and $699 per month in disability payments from Chrysler; however, the Chrysler payments would increase by $400 per month after she retires. Diana further stated that she is unable to retire until after the divorce is final because Dale refuses to "sign off" on her pension. Diana testified that, before his incarceration, Dale made approximately 100,000 per year working at Ford, and he earned additional income making and selling miniature replicas of cannons for $1,500 each.
 {¶ 15} Diana testified as to the parties' assets, including the marital home, which the parties stipulated had a value of $150,000, household furnishings, jewelry, Dale's tools, and several automobiles. Diana also testified that, at one time, Dale had a box of approximately 200 gold coins; however, the box disappeared before he left the marital home.
 {¶ 16} In addition, evidence was presented as to various financial accounts owned by the parties. Specifically, Diana introduced the following evidence: a copy of the parties' 1999 federal income tax return showing interest earned on a Sun Coast account, which Diana stated had a value of $15,000; a 2001 statement showing a Ford Motor Company money market account valued at $3,500; a credit application completed by Dale in 1999 for the purchase of the sailboat which listed as assets a $15,000 account at Charter One Bank and a $15,000 account at Sun America Credit Union; a 1997 statement showing a Lord Abbett investment account valued at $12,800; and a 2001 statement showing a Key Bank CD valued at $10,000. In addition to the above, Diana introduced a copy of a 1099-INT statement showing $500 in interest earned on a United Bank account in 2001, after which she testified, over objection, that the account was initially established with a deposit of $10,000.
 {¶ 17} Dale's attorney raised objections to the introduction of the Charter One, Sun America and Lord Abbett statements on the basis of relevance; however, the objections were overruled. Dale's attorney also objected to Diana's testimony that Dale's son may have possession of the $10,000 from the United Bank account. He did not object to Diana's testimony concerning the existence of the box of gold coins, and no evidence was introduced as to what may have happened to any of the above assets.
 {¶ 18} As to the parties' lifestyle Diana stated that, during the marriage, they were able to afford vacations in the Caribbean, and frequently ate in expensive restaurants, all without incurring credit card debt. She also stated that in 1999, Dale purchased a sailboat for $110,000; however, she allowed the sailboat to be repossessed after Dale went to prison, because she could not afford to make the payments. Diana further stated that, without Dale's additional income, she was unable to pay her monthly expenses and was forced to use credit cards and borrow money from her mother.
 {¶ 19} On April 1, 2003, the trial court granted the parties a divorce. In its judgment entry, the trial court classified certain assets as nonmarital and awarded each spouse his or her own separate, nonmarital property.
 {¶ 20} In addition, the trial court found that Dale had caused harm to Diana and committed "economic waste" of the parties' resources by losing his job, becoming incarcerated, and incurring attorney fees for his criminal defense. The court further stated that:
 {¶ 21} "The awarding of spousal [support] is precluded due to [Dale's] incarceration for his criminal offenses. Therefore, the Court in making the following division of property and debt does so, in part, in lieu of awarding the wife spousal support."
 {¶ 22} The trial court then divided the parties' marital assets. The court awarded Diana the following: the marital home ($105,000),[1] with a remaining mortgage debt of $8,500; two cemetery lots valued at $500; the entire marital portion of her Chrysler pension (unvalued); one-half of Dale's Ford pension (to be valued and divided through a Qualified Domestic Relations Order); her own 401(K) plan valued at $20,400; Dale's 401(K) plan, valued at $41,000 (after Dale removed $25,000 to pay his criminal attorney); $5,000 from a $10,000 escrow account held by Dale's criminal attorney; a 2000 Lincoln valued at $14,600, subject to a lien of $4,600; a 1999 Ford Taurus valued at $5,375; $300 in proceeds from the sale of a 1994 Mercury Tracer; Dale's firearms valued at $8,000; eight gold coins of unknown value; other coins, jewelry and miscellaneous personal property (unvalued); a $5,000 Rolex watch; various financial accounts with an aggregate value of $9,000; the entire marital portion of Dale's Roth IRA, valued at $10,000; miscellaneous tools and household goods valued at $8,500; and "such other property [Diana] has in her possession, not otherwise disposed of herein, and her own jewelry, goods and personal effects." In addition, the court ordered Diana to repay a $6,000 loan from her mother, a $1,000 loan from a friend, and all credit card and other debt she incurred in her own name since the divorce complaint was filed.
 {¶ 23} The court awarded Dale the following marital assets: a box of 200 gold coins "if such exists"; financial accounts, "or the proceeds therefrom, as may exist" with Sun Coast, valued at $15,000; the Ford Motor Company account, valued at $3,500; the Charter One Bank account, valued at $15,000; the Sun American account, valued at $15,000; the Key Bank checking account, with a balance of $800; the $10,000 Key Bank CD; the Lord Abbett investment account, valued at $12,800; and the United Bank account, valued at $10,000. The court also awarded Dale his entire Chrysler pension, and one-half of his Ford Pension. In addition, the court ordered Dale to pay the outstanding debt of $88,000 on the repossessed sailboat, and any other debts incurred in his own name.
 {¶ 24} The trial court stated that, in dividing the marital property, it had taken into account the relevant factors, including those set forth in R.C. 3105.18. Specifically, the court found that Diana, at 53 years of age, was "permanently disabled due to physical health problems" and is currently receiving disability benefits. The court also found that Diana was a victim of Dale's plot to have her murdered; she was forced to leave her home several times, at her own expense, to avoid harm; and she must have counseling "as a result of her victimization."
 {¶ 25} The trial court found that, at 58 years of age, Dale enjoys good health. The court found that, prior to his incarceration, Dale was earning $100,000 per year working at Ford, in addition to earning extra income making miniature brass cannons. The trial court also found that, prior to their separation, the parties lived a relatively luxurious lifestyle without incurring credit card debt.
 {¶ 26} The trial court concluded as follows:
 {¶ 27} "Upon consideration of the relevant factors, the length of the marriage and the parties' respective voluntary behaviors, the Court finds that the husband should pay spousal support to the wife. However, due to the husband's incarceration and the reasons therefor, the award of spousal support is neither feasible nor practical. Therefore, the court makes its disproportionate property division as set forth above in lieu of spousal support." On April 29, 2003, a timely notice of appeal was filed.
 {¶ 28} Dale asserts in his third assignment of error that the trial court abused its discretion when it found that Diana was permanently disabled. In support thereof, appellant argues that it is inappropriate for a court to make a finding regarding a spouse's physical disability in the absence of expert medical testimony.
 {¶ 29} Ohio courts have held that not only is a medical diagnosis unnecessary to support a finding that a spouse is unable to work, it is insufficient to support such a finding.Milam v. Milam (Oct. 19, 1994), 2nd Dist. No. 94-CA-23;Billingham v. Billingham (Feb. 16, 2001), 2nd Dist. No. 18403. Unlike personal injury cases, where medical testimony is required to prove a causal relationship between a physical injury and the act that gave rise to such injury, in divorce cases, the medical cause of a spouse's disability "is not an essential fact requiring proof * * *" Milam, supra. It is sufficient that the party asserting the disability is available to testify as to his or her own experience and is subjected to cross-examination.Billingham, supra, citing Gullia v. Gullia (1994),93 Ohio App.3d 653, 662.
 {¶ 30} In reviewing the trial court's determination as to Diana's disability, we must keep in mind that the trial court is in the best position to view the witness, observe her demeanor, and weigh her credibility. Seasons Coal Co., Inc. v. Cleveland
(1984), 10 Ohio St.3d 77, 80. Accordingly, the trial court's judgment will not be reversed on appeal as being against the manifest weight of the evidence if it is supported by "some competent, credible evidence going to all the essential elements of the case." C.E. Morris co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280.
 {¶ 31} On the issue of her physical limitations, Diana testified as follows:
 {¶ 32} Question: "When was the last — when's the last time you worked at Jeep?
 {¶ 33} Diana: "I believe it was in October of 2000.
 {¶ 34} Question: "And what caused you to stop working at that point in time?
 {¶ 35} Diana: "They had finally came up with what was wrong with me * * *, it was rheumatoid arthritis and osteoporosis.
 {¶ 36} Question: "And as a result of those conditions are you able to work?
 {¶ 37} Diana: "No.
 {¶ 38} Question: "What is your understanding about the care and treatment that you need for those conditions?
 {¶ 39} Diana: "It will get worse, more doctors, more drugs, more whatever.
 {¶ 40} Question: "How does that affect you today?
 {¶ 41} Diana: "A lot. Sometimes I cannot walk. Sometimes I can't use my hands, either one, needing help, care from someone else.
 {¶ 42} Question: "You had to have people help you, assist you because of this?
 {¶ 43} Diana: "Definitely. There are times I can't even dress myself, yes.
 {¶ 44} Question: "What is your understanding — are there certain things that you need to avoid as a result of your condition?
 {¶ 45} Diana: "Anything repetitive, any lifting. I'm supposed to rest this to inflame [sic] anything. I can do some things, but to rest after it.
 {¶ 46} "* * *
 {¶ 47} Question: "Is there any likelihood that you're going to be able to work again?
 {¶ 48} Diana: "No.
 {¶ 49} Question: "Are you aware of there being any cure available for your condition where it would put you in a position to be able to work again?
 {¶ 50} Diana: There is none."
 {¶ 51} On cross-examination, Diana stated that, because of her medical condition, she desired to move to a warmer climate in the future.
 {¶ 52} Upon consideration of the foregoing, this court finds that the trial court's determination that Diana was permanently disabled was supported by competent, credible evidence. Accordingly, the trial court's finding was not against the manifest weight of the evidence, and Dale's third assignment of error is not well-taken.
 {¶ 53} In support of his first assignment of error, Dale asserts that the trial court erred by awarding Diana an excessive amount of marital property in lieu of spousal support. In support thereof, Dale first argues that the trial court erred by failing to find that Diana established a need for spousal support, or to make findings as to the basis of a spousal support award. Dale further argues that the trial court awarded him $102,100 in "nonexistent" assets as part of its division of marital property. Finally, Dale argues that the trial court erred by ordering him to pay the $80,000 outstanding boat loan, and awarding Diana a greater portion of marital property, in order to "punish" him for his criminal behavior.
 {¶ 54} As to the trial court's determination that Diana was entitled to spousal support, it is well-settled that a trial court has broad discretion in making such determinations. Kunklev. Kunkle (1990), 51 Ohio St.3d 64, 67; Holcomb v. Holcomb
(1989), 44 Ohio St.3d 128. A reviewing court may not substitute its judgment for that of the trial court, absent a finding of an abuse of discretion. Kunkle, supra; Holcomb, supra. As previously noted, an abuse of discretion is more than a mere error of law; "it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 55} The primary purpose of a spousal support award is to provide for the financial needs of an ex-spouse. Moell v. Moell
(1994), 98 Ohio App.3d 748, 751. Pursuant to R.C. 3105.18(C), in determining the necessity for and amount of spousal support, the trial court must consider the 14 factors provided therein, including, but not limited to: 1) the relative earning abilities of the parties; 2) the ages and physical, mental, and emotional conditions of the parties; 3) the retirement benefits of the parties; 4) the duration of the marriage; 5) the standard of living the parties established during the marriage; 6) the relative education of the parties; 7) the relative assets and debts of the parties, including but not limited to any court-ordered payments by the parties; 8) the tax consequences for each party of an award of spousal support; or 9) any other factor that the court expressly finds to be relevant and equitable.
 {¶ 56} In this case, the trial court stated that it had reviewed the relevant factors set forth in R.C. 3105.18, including the duration of the marriage, the parties' ages, physical health, and retirement benefits, and standard of living they enjoyed during the marriage. The trial court noted that Diana was currently receiving disability benefits, and that Dale was making $100,000 per year working at Ford before he engaged in criminal activity that caused his incarceration and subsequent loss of employment. The trial court took particular note of the fact that Dale's criminal activities included attempting to have his wife killed.
 {¶ 57} Upon consideration of the foregoing, we cannot say that the trial court erred by finding, under the particular circumstances of this case, that Diana would have been entitled to spousal support if Dale had not become incarcerated. Dale's first argument has no merit.
 {¶ 58} Dale next argues that the trial court awarded him the following "nonexistent" assets:
 {¶ 59} "A box of 200 gold coins, if such exists (evidence was based on Appellee's `guess' as to the amount of coins she saw in a 4 and ½" by 9 and ½" box in 2001)
 {¶ 60} "Sun Coast financial account valued at $15,000 * * *
 {¶ 61} "Ford Motor Company money market valued at $3,500 * * *
 {¶ 62} "Sun Coast financial account valued at $15,000 * * *
 {¶ 63} "Lord Abbett valued at $12,800 * * *
 {¶ 64} "United Bank financial account valued at $10,000 * * *
 {¶ 65} "Key Bank valued at $10,000 * * *
 {¶ 66} "TOTAL $102,000 (Does not include the box of 200 gold coins as estimated in [Diana's] testimony as $40,000-45,000)"
 {¶ 67} Generally, the trial court is vested with broad discretion, based on the particular facts and circumstances of each case, to determine the value of a marital asset for purposes of dividing marital property. James v. James (1995),101 Ohio App.3d 668, 687. In divorce actions, Ohio courts have generally held that an owner of either real or personal property is competent to testify as to the market value of such property.Nekrosius v. Nekrosius (July 16, 1993), 2nd Dist. No. 13700, citing Smith v. Padgett (1987), 32 Ohio St.3d 344. In reviewing the trial court's findings, an appellate court must keep in mind that the trial court was in the best position to observe the witnesses and their demeanor, and thereafter weigh the credibility of the testimony given at trial. Seasons CoalCo, Inc., supra.
 {¶ 68} A review of the record reveals the following facts. Diana presented undisputed testimony at the hearing that Dale had a box containing an estimated 200 gold Kruggerands, which were worth approximately $350 each. She also testified that the box disappeared in September 2001, and that Dale told her his son had access to a safe deposit box that contained gold. Although Dale's attorney objected to her testimony regarding how many coins were in the box, no objection was made as to her testimony that the box existed, or that Dale's son had access to Dale's gold. In addition, Dale presented no evidence to rebut Diana's testimony that the financial accounts in question existed at some point during the marriage, or to show what happened to the funds from those accounts if they were liquidated at some time before the divorce hearing was held.
 {¶ 69} Upon consideration of the foregoing, we cannot say that the trial court abused its discretion by accepting Diana's testimony as to the existence of the parties' financial assets, and thereafter assigning them a value for purposes of dividing the marital property. Dale's second argument has no merit.
 {¶ 70} As to Dale's argument concerning the trial court's unequal division of marital property, it is well-settled that, in divorce proceedings, the division of marital property is to be equal, unless an equal division would produce an inequitable result. R.C. 3105.171(C). In such a case, marital property is to be divided on an equitable basis. Cherry v. Cherry (1981),66 Ohio St.2d 348, 355. R.C. 3105.171(F) sets forth nine factors that trial court should consider in making a division of marital property, including:
 {¶ 71} "(1) The duration of the marriage;
 {¶ 72} "(2) The assets and liabilities of the spouses;
 {¶ 73} "(3) * * *
 {¶ 74} "(4) The liquidity of the property to be distributed;
 {¶ 75} "(5) The economic desirability of retaining intact an asset or an interest in an asset;
 {¶ 76} "(6) the tax consequences of the property division upon the respective awards to be made to each spouse;
 {¶ 77} "(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;
 {¶ 78} "* * *
 {¶ 79} "(9) Any other factor that the court expressly finds to be relevant and equitable.
 {¶ 80} On appeal, a trial court's division of marital property will not be reversed absent a finding that the court abused its discretion. Landry v. Landry (1995),105 Ohio App.3d 289, 291, citing Martin v. Martin (1985), 18 Ohio St.3d 292,294. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore, supra. The mere fact that a property division is unequal does not amount to an abuse of discretion. Cherry, supra, paragraph two of the syllabus.
 {¶ 81} In Leadingham v. Leadingham (1997),120 Ohio App.3d 496, a husband was fired from his employment after being convicted of cocaine possession. As a result, his future pension benefits were greatly reduced. In allocating the parties' marital assets, the trial court imputed years of future employment to the husband, resulting in a disproportionate amount of the parties' pension benefits going to the wife. On appeal, the appellate court found that the trial court acted within its discretion because, although the husband "may not have intended to lose his job and the chance to accrue full pension benefits, * * * his misconduct was intentional, voluntary, and foreseeably led to that result." Id.
 {¶ 82} In Dragojevic-Wiczen v. Wiczen (1995),101 Ohio App.3d 152, the trial court determined that, as a result of his criminal behavior, the husband lost $100,000 in marital income and had to pay $20,000 to his criminal attorney. The trial court found that the husband's criminal act resulted in economic hardship to the wife, and awarded her two-thirds of the parties' marital assets. After reviewing the available portions of the record on appeal, the appellate court stated:
 {¶ 83} "Implicit in the trial court's property division was a conclusion that appellant's criminal conviction and resulting incarceration rendered an equal division of marital property inequitable. In light of the discretion afforded the trial court in such a situation, we cannot say that the trial court's division of marital property constituted an abuse of discretion." Id. at 156.
 {¶ 84} In Taylor v. Taylor (Nov. 19, 1999), 2nd Dist. No. 17727, a husband was convicted of two counts of murder and one count of attempted murder. The last charge resulted when he attempted to murder his soon-to-be ex-wife. As a result of his incarceration, the husband lost his $70,000 per year job at General Motors.
 {¶ 85} As part of the divorce proceedings, the trial court awarded virtually all of the marital assets to the wife, who was 64 years old, had limited eyesight, was homeless, could not drive a car, and had only an eighth grade education. On appeal, the appellate court, citing Leadingham, supra, and Wiczen, supra, found that the trial court had not abused its discretion by finding that the voluntary criminal acts of the husband, which resulted in his incarceration, had rendered an equal division of marital property inequitable. Id.
 {¶ 86} As set forth above, the record in this case contains evidence that Dale engaged in criminal activity during the course of the parties' marriage, and even attempted to have Diana killed so that she could not testify against him at trial. The record further shows that Dale's conviction and subsequent imprisonment directly resulted in his loss of employment.
 {¶ 87} Upon consideration of the foregoing, we cannot say that the trial court abused its discretion by finding that Diana would have been entitled to spousal support if Dale's criminal misconduct had not rendered such an award "neither feasible nor practical," and awarding Diana a disproportionate share of the parties' marital assets on that basis. Dale's third argument has no merit.
 {¶ 88} As to whether the trial court abused its discretion by ordering Dale to pay the $80,000 loan that resulted from the repossession of the sailboat, evidence was presented at the hearing that Dale unilaterally applied for a loan to purchase the boat. Diana testified at the hearing that she did not want Dale to purchase the boat, and her name did not appear on the loan application, the loan documents, or the title to the boat. In addition, Dale admits on appeal that the boat was repossessed because Diana did not make the payments after he was sent to prison. Under such circumstances, we cannot say that the trial court abused its discretion by ordering Dale to pay the remaining outstanding loan on the sailboat as part of the division of marital property.
 {¶ 89} This court has reviewed the entire record of proceedings that was before the trial court and, upon consideration thereof and the law, finds that the trial court did not abuse its discretion by accepting Diana's testimony as to the existence and value of the marital assets, or by finding that Diana would have been entitled to spousal support and making an unequal distribution of marital property and debt on that basis. Dale's first assignment of error is not well-taken.
 {¶ 90} Dale asserts in his fourth assignment of error that the trial court erred by not valuing the marital portion of Diana's Chrysler Jeep pension before dividing the parties' marital assets. It is undisputed that, although Diana was currently receiving disability retirement benefits at the time of the divorce hearing, she intended to begin receiving ordinary retirement benefits after the divorce.
 {¶ 91} In a divorce action, the trial court is vested with broad discretion to equitably divide the parties' marital assets and thereafter consider the appropriateness of a spousal support award. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 130. Generally, disability payments are not considered marital property. Okos v. Okos (2000), 137 Ohio App.3d 563, 568. However, pension or retirement benefits earned by one or both parties during the course of a marriage are marital assets and should be considered both in the division of marital property and in relationship to an award of spousal support. Id., citing Hoytv. Hoyt (1990), 53 Ohio St.3d 177, 178-179; R.C.3105.171(A)(3)(a)(ii).
 {¶ 92} It is well-settled that, although a trial court has broad discretion to value marital property, it is not free to omit valuation altogether. Schuller v. Schuller (Feb. 7, 1997), 6th Dist. No. F-96-012, citing Goode v. Goode (1991),70 Ohio App.3d 125, 132. In cases where the lower court has failed to classify and value all of the marital property, "an appellate court cannot effectively review the property distribution." Id., citing Spychalski v. Spychalski (1992), 80 Ohio App.3d 10;Mochko v. Mochko (1990), 63 Ohio App.3d 671.
 {¶ 93} A review of the record in this case demonstrates that Dale's attorney argued at the divorce hearing that, to the extent that Diana's pension was not a disability pension, it should be valued and divided as a marital asset. No further attempt was made to request information from Diana regarding her pension, and the trial court did not expressly rule on Dale's request to value Diana's pension. However, in its judgment entry, the trial court stated that, after reviewing all the evidence produced at the hearing regarding the parties' pensions, it was awarding Diana "[h]er pension through Chrysler, which is currently in `disability' pay mode, but which will transform in 'retirement' pay mode following the divorce, according to the wife's testimony."
 {¶ 94} Upon consideration of the foregoing, we find that the trial court erred by not distinguishing between Diana's disability pay and her retirement pension. Accordingly, the trial court abused its discretion by failing to value the retirement portion of Diana's pension before awarding it to her as part of the division of marital property. Appellant's fourth assignment of error is well-taken.
 {¶ 95} In support of his second assignment of error, Dale asserts that the trial court abused its discretion by not providing this court with a sufficient basis upon which to review the unequal division of marital property as required by R.C.3105.171(G). Dale further argues that the trial court erred by not dividing the parties' marital property before awarding additional assets to Diana in lieu of spousal support.
 {¶ 96} A trial court has broad discretion in dividing property in domestic relations cases. Berish v. Berish (1982),69 Ohio St.2d 318, 319. A trial court's division of marital property will not be overturned on appeal absent a finding of abuse of discretion. Id. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore, supra.
 {¶ 97} In fashioning a division of marital property, "the trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law." Kaechele v.Kaechele (1988), 35 Ohio St.3d 93, paragraph two of the syllabus. This requirement is particularly important in a case involving an unequal division of marital assets. Green v.Shall, 6th Dist. No. L-03-1123, 2004-Ohio-1653, ¶ 30, citingSzerlip v. Szerlip (1998), 129 Ohio App.3d 506, 512.
 {¶ 98} R.C. 3105.171 provides, in relevant part, that:
 {¶ 99} "(C)(1) Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section."
 {¶ 100} Pursuant to R.C. 3105.171(C)(3), "the court shall provide for an equitable division of marital property under this section prior to making any award of spousal support to either spouse under section 3105.18 of the Revised Code and without regard to any spousal support so awarded." In addition, R.C.3105.171(G) states that "[i]n any order for the division or disbursement of property or a distributive award made pursuant to this section, the court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of `during the marriage.'"
 {¶ 101} In considering the trial court's obligation to make findings of fact pursuant to R.C. 3105.171, the appellate court in Szerlip, supra, stated that:
 {¶ 102} "there is good reason to require findings of fact and law when property is not divided equally. Unequal division of marital assets is allowed by statute only in order to reach an equitable outcome. In order for reviewing courts to determine whether the demands of [the] statute have been satisfied, the trial court must provide a basis for appellate review by recording findings of fact which support its decision." Id. at 512, citing Kaechele, supra; Gibson v. Gibson (1993),87 Ohio App.3d 426.
 {¶ 103} In this case, before dividing the marital property, the trial court stated that it had considered the factors set forth in R.C. 3105.18 which are relevant to an award of spousal support. In addition, as set forth above, the trial court found that Dale's criminal actions and subsequent loss of employment made a spousal support award "impracticable." However, the trial court did not first divide the parties' marital assets without regard to an award of spousal support, as required by R.C.3105.171(C)(3). Finally, although the trial court specified the duration of the parties' marriage as between July 25, 1988 and February 4, 2003, it did not make any specific findings pursuant to R.C. 3105.171(G) to support a determination that the marital property had been equitably, if not equally, divided.
 {¶ 104} This court has reviewed the entire record that was before the trial court and, upon consideration thereof and the law, finds that the trial court abused its discretion by not providing for the equitable division of martial property before considering an award in lieu of spousal support, as required by R.C. 3105.171(C), and by not making the requisite findings pursuant R.C. 3105.171(G) in support of its unequal division of marital property. Dale's second assignment of error is well-taken.
 {¶ 105} The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is hereby reversed in part and affirmed in part. This case is remanded to the trial court for further proceedings consistent with this decision and judgment entry, which shall include: (1) valuing the marital portion, if any, of Diana's retirement pension through Chrysler Jeep; (2) making the requisite findings pursuant to R.C.3105.171(C) that are relevant to the division of marital property before considering an additional award in lieu of spousal support; (3) making the requisite findings pursuant to R.C.3105.171(G) in support of an unequal division of marital property; and (4) making a specific finding as to the value of the marital home in light of the parties' joint stipulation as to its value. Court costs of these proceedings are assessed equally to appellant, Dale Quigley, and appellee, Diana Quigley.
JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART.
Knepper, J., Pietrykowski, J., Singer, J., concur.
[1] The record shows that the parties stipulated at the divorce hearing that the value of the marital home was $150,000.