IN RE ESTATE OF THOMAS W. TIZZARD III, ALSO KNOWN
AS THOMAS W. TIZZARD, DECEASED.
SANDRA J. TIZZARD, APPELLEE, V. RENA A. TIZZARD,
PERSONAL REPRESENTATIVE OF THE ESTATE OF
THOMAS W. TIZZARD III, DECEASED, APPELLANT.

708 N.W.2d 277

Filed December 20, 2005.   No. A-04-618.

Jay A. Ferguson for appellant.

Dennis E. Martin and Kevin J. McCoy, of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, L.L.P., for appellee.

SIEVERS, CARLSON, and CASSEL, Judges.

SIEVERS, Judge.

## INTRODUCTION

This appeal involves a claim that an Internal Revenue Service (IRS) "Miscellaneous Income" form 1099 (hereinafter Form 1099) issued by the personal representative of an estate was inaccurate. The recipient of the disputed Form 1099, Sandra J. Tizzard, contends that the personal representative, Rena A. Tizzard, should not have issued a Form 1099 showing that Sandra received $144,000 in miscellaneous income from the estate of Thomas W. Tizzard III, also known as Thomas W. Tizzard, who is the deceased former husband of both Sandra and Rena. The county court for Douglas County reopened Thomas' estate and ultimately granted Sandra's motion for summary judgment, finding that "at no time did the Estate pay $144,000.00 to [Sandra] as alleged in the [Form 1099] sent to [Sandra]." The court further ordered Rena, as the personal representative, to file an amended Form 1099 "showing $0 paid to [Sandra] by the Estate."

We find that Sandra did not present a justiciable issue to the county court, because her claim that she received an inaccurate Form 1099, to the extent that it presents any issue, presents only a matter of federal income tax law. Therefore, we find that the county court erred in granting summary judgment, and we vacate the judgment of the county court and order that Sandra's application be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

The record shows that Thomas, the decedent, was first married to Rena. After their divorce, Thomas married Sandra on January 1, 1989. On October 18, 1999, Sandra and Thomas' marriage was dissolved, and the decree incorporated their April 16, 1999, property settlement agreement. Part of that agreement provided as follows: "Alimony shall terminate: 1. upon the death of either party, the remarriage of [Sandra], 2. or upon [Sandra's] cohabitation with an unrelated adult with whom she shares living expenses, 3. or, the passage of 72 months."

The agreement further provided:

> [Thomas] shall maintain existing life insurance through his employer . . . on his life naming [Sandra] as primary beneficiary for an amount sufficient to cover the outstanding alimony obligation as ordered under the terms of this Decree. [Thomas] shall periodically provide proof, at [Sandra's] request, that sufficient insurance is in force and that the coverage remains adequate.

Despite the above provision, the record shows that on December 14, 1999, Thomas submitted a change of beneficiary to his life insurance company designating Rena as the primary beneficiary instead of Sandra. On January 3, 2000, Thomas died, and Rena was appointed as personal representative of Thomas' estate.

Subsequently, both Sandra and Rena made claims against Thomas' life insurance policy. In February 2000, Sandra filed a claim against the estate, alleging "[a]limony" due in the amount of $144,000. Sandra amended her claim in March to "64 monthly alimony payments" of $2,250 each, as well as life insurance proceeds of $144,000, noting in such amendment with respect to the insurance claim that the "[v]alue" of the second claim "is a repeat of Claim No. 1"—which notation is clearly Sandra's admission that she is only entitled to satisfaction of one or the other of her two claims for $144,000. Rena, as personal representative, disallowed both of Sandra's claims on April 10.

Thomas' life insurance company then filed an interpleader action in federal district court, noting Sandra's and Rena's competing claims to Thomas' life insurance proceeds and making

both Sandra and Rena parties. As part of that action, the company paid $178,500 in life insurance proceeds into federal court. The interpleader action was settled by a stipulation filed in the federal court on February 1, 2002, which provided for the execution of a mutual release by Sandra, by Rena, and notably by Rena as personal representative of the estate—although the estate was not a party in the interpleader action. Under the stipulation, Sandra and Rena agreed that Sandra would receive $144,000, which amount was described therein as "representing 63 unpaid alimony payments by Thomas . . . in the amount of $141,750.00, plus $2,250.00 in interest," and that Rena was entitled to the remainder of the proceeds of the life insurance policy. Pursuant to the stipulation, the clerk of the federal district court paid such funds to the trust accounts of Sandra's and Rena's attorneys, and the interpleader action was dismissed. The mutual release was signed by Sandra and Rena individually and again by Rena as the personal representative of Thomas' estate.

On July 24, 2002, the estate was closed by entry of an order of complete settlement. A receipt signed by Sandra was filed with the county court on July 26. That receipt states:

> [Sandra] hereby acknowledges receipt of the following described property . . . [:]
>
> Claim No. 1. 64 monthly alimony payments due to Sandra . . . in the amount of $2,250.00 per month.
>
> Claim No. 2: Life insurance proceeds due to [Sandra] for [Thomas'] policy issued through his place of employment by [Thomas' life insurance company].

In January 2003, Sandra received a Form 1099 showing payment by Thomas' estate of $144,000 to Sandra, and such amount was listed on the form in the box entitled "Other Income."

On August 26, 2003, Sandra filed an application to reopen the estate stating that Rena had sent the Form 1099 after her discharge as personal representative, that Rena was attempting to subject Sandra to income tax "by sending her a Form 1099 showing $144,000.00 in taxable income paid to her, [and that such Form 1099 was] false as to [Sandra]." In her prayer for relief, Sandra asked for a "declaration that at no time did the Estate pay $144,000.00 to [Sandra]" and asked that Rena, as the

personal representative, be ordered "to file an amended [Form] 1099 showing $0 paid to [Sandra]."

Sandra's application also stated that she discovered that Rena had submitted a petition for determination of inheritance tax, showing a deduction under "Debts Paid for Which [Thomas] Was Liable At Death" of $144,000, the amount paid to Sandra in settlement of the interpleader action. Sandra noted that Rena had taken this amount as a deduction against her own inheritance tax, reducing to $0 what otherwise would have been a taxable amount of $133,713.77. The record before us bears out that in Rena's final accounting of Thomas' estate, she deducted $144,000, describing the deduction as "Ex-wife's divorce decree alimony." Sandra alleged that at no time did she receive $144,000 in alimony from the estate, nor did the estate ever have any interest in or possession of the $144,000 in life insurance proceeds paid to Sandra via the interpleader action. Perhaps inconsistent with such pleading is Sandra's signed receipt from which we quoted above.

On December 11, 2003, the county court granted Sandra's application to reopen the estate. On April 28, 2004, Sandra filed a motion for summary judgment. In her motion, Sandra sought the same relief we have previously detailed from her application. On May 13, the court held a hearing on Sandra's motion for summary judgment at which Sandra offered into evidence a letter from Rena to the IRS dated October 6, 2003, which stated:

Dear IRS:

I am not sure exactly what to do about this. I previously sent a [Form] 1099, as [personal representative of Thomas' estate], because I thought I was supposed to report this as alimony. A copy is enclosed. Sandra . . . has raised objection to this [Form] 1099['s] being from the Estate. Enclosed please find true copies of the Federal Court documents that settled this issue, or so I thought. If this alimony was supposed to be reported by me individually then please instruct me and I will send in a new [Form] 1099. If it was supposed to be reported by the Estate, then I am sorry to have bothered you.

Attached to that letter was a copy of the Form 1099 Rena sent to Sandra. The payor is listed as Thomas' estate, with Rena as

personal representative. In the box entitled "Other Income" is the amount of $144,000, and the recipient is listed as Sandra. Sandra also offered into evidence the settlement stipulation between Sandra and Rena in the interpleader action.

Rena likewise offered two exhibits into evidence. The first was an affidavit by one of Rena's attorneys which we deem not to be pertinent except to the extent that it attached a copy of a letter, the original of which was received as Rena's second exhibit. This letter, dated May 10, 2004, was from the IRS and was signed by Mark Munsterman, "Tax Specialist." The caption on Munsterman's letter reads, "Re: Issuance of Form 1099-MISC re Alimony Payments re [Thomas' estate]," and the letter is addressed to Rena's attorneys. Munsterman's letter recites the core facts, much as we have detailed them above, including a summary of the federal court interpleader action and its resolution by payment of the $144,000 to Sandra, which payment, Munsterman said, "was to fulfill [Thomas'] alimony obligation." Munsterman's letter also states, "The fact that life insurance was the source of the funds for the payment of the alimony claim does not affect the includability of the payment as ordinary income in Sandra's income tax return for the year of receipt," citing "Income Tax Reg. §1.101-5 of the Internal Revenue Code." Munsterman concluded his letter by saying that because the payment "was made to satisfy a claim made against [Thomas' estate] and [because] Rena agreed to the payment in her capacity as the Personal Representative . . . Rena as the Personal Representative is the proper party to issue the [Form 1099] to Sandra."

## ASSIGNMENTS OF ERROR

Generally, Rena contends that the county court erred in its grant of summary judgment; however, we do not set forth her exact assignments of error because ultimately, we resolve this case on a very fundamental jurisdictional premise of Nebraska law.

## STANDARD OF REVIEW

The appellate court has the duty to determine whether the lower court had the power, that is, the subject matter jurisdiction, to enter the judgment or other final order sought to be reviewed,

and to vacate an order of the lower court entered without jurisdiction. See *State v. Jacques*, 253 Neb. 247, 570 N.W.2d 331 (1997).

## ANALYSIS

After thoroughly considering the record, the briefing, and the oral argument, we believe that this litigation can be distilled down to its essence in the following brief paragraph, remembering that what transpired in Sandra's divorce, in the resolution of Thomas' estate, in the interpleader action, and with the IRS up to the time of the summary judgment hearing constitute essentially undisputed facts:

Clearly, the federal income tax consequences which Sandra perceives to be deriving from the issued Form 1099 are the core of and the motivation for this litigation. Put another way, absent adverse tax consequences for Sandra, the disputed Form 1099 is a matter of no consequence for Sandra. Sandra does not want the $144,000 classified as alimony because she would likely be obligated to pay federal income tax on the money. Therefore, as a sort of preemptive strike (against the IRS, we surmise), Sandra sought the county court's help to get a federal tax form amended to show that she got nothing from Thomas' estate rather than $144,000 as now shown by the Form 1099 issued to her by the estate. But, there is no doubt from the record that irrespective of what the Form 1099 originally said, or might be modified to say, the IRS is fully aware that Sandra received $144,000 as a result of the resolution of the federal court interpleader action. Thus, the IRS' awareness of Sandra's receipt of this money certainly does not hinge on the Form 1099 or what it says— Munsterman's letter proves this proposition. Therefore, bearing in mind the essence of the matter, the crucial question for us becomes whether Sandra presented a justiciable issue.

We answer the question by noting that the premise upon which Sandra brings this litigation is flawed. The notion that gaining the relief Sandra desires—an amended Form 1099 to show $0 received from the estate—will make a difference to the IRS is flawed because what the Nebraska state courts say about the Form 1099 does not determine a federal tax issue generally or determine the taxability of the $144,000 in particular.

■ The determination of whether a person owes federal income tax on money received does not occur in the Nebraska state courts. Instead, if the taxpayer receives a proposed adjustment to a return from the IRS (for example, because Sandra did not report the $144,000 as taxable income), the taxpayer can in certain circumstances request that the matter be considered by the IRS Appeals Office or, in other situations, after a notice of deficiency, file a petition for redetermination of the deficiency with the U.S. Tax Court; or, the taxpayer can pay the tax and then file a request for a refund which, if denied, can then be litigated in a U.S. District Court. See 26 C.F.R. § 601.103 (2005) (summary of general tax procedure). While we have used a "bare bones" treatment of how disputes over federal income tax are resolved, it is sufficient to demonstrate the general proposition that Nebraska's courts do not determine federal taxability, and Sandra cites no authority to the contrary.

■ We next turn to a longstanding principle having its roots in basic precepts of federalism, as illustrated by *Bardwell v. C. I. R.*, 318 F.2d 786 (10th Cir. 1963). In *Bardwell*, a former wife was to receive monthly payments of $425 after her divorce and her former husband was to place certain insurance policies in trust from which the former wife would be paid $600 per month if he died. Although the former husband was apparently still alive, the former wife and the IRS disagreed about how the monthly payments were to be treated, the former wife arguing that under Colorado law, the payments were not taxable alimony, but, rather, were made in discharge of a property settlement. The *Bardwell* court said that "state law is not binding on federal courts in determining income tax questions arising out of situations such as this." 318 F.2d at 789. The statutory reference in the *Bardwell* opinion regarding "situations such as this" was to the annotated counterpart to I.R.C. § 71 (1952), which was the federal statute making "[a]limony and separate maintenance payments" includable in gross income for federal tax purposes as well as defining what shall be considered alimony or separate maintenance payments. The *Bardwell* court also said that it was no more bound by the labels which parties to the payments put on them than it was by state law. See *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S. Ct. 1776, 18 L. Ed. 2d

886 (1967) (where federal estate tax liability turns upon character of property interest held and transferred by decedent under state law, federal authorities are not bound by determination made of such property interest by state court), *nonacq. on other grounds* 1968-2 C.B. 3. See, also, *United States v. Craft*, 535 U.S. 274, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002) (holding that state law determines only which sticks are in person's bundle; whether those sticks qualify as "property" for purpose of federal tax lien statute is question of federal law, and in answering question of federal law, the U.S. Supreme Court is in no way bound by state courts' answers to similar questions involving state law); *United States v. Mitchell*, 403 U.S. 190, 91 S. Ct. 1763, 29 L. Ed. 2d 406 (1971) (state law creates legal interests, but federal statute determines when and how they shall be taxed); *Burnet v. Harmel*, 287 U.S. 103, 53 S. Ct. 74, 77 L. Ed. 199 (1932); *Pahl v. C.I.R.*, 150 F.3d 1124 (9th Cir. 1998) (holding that courts look to federal law to determine what interest creates tax liability, but look to state law to determine whether taxpayer has requisite interest).

▮▮▮ Therefore, from the foregoing authority, it is abundantly clear that whatever the county court might order about the content of the Form 1099 does not make any difference on the only issue with which Sandra is truly concerned—the federal income taxability of the $144,000. The evidence which is central to our analysis of this appeal is (1) the stipulation and the mutual release earlier detailed which settled the interpleader action and (2) the property settlement agreement between Thomas and Sandra executed as part of their divorce. These key documents are subject to the law of contracts. See *Fleming Co. of Nebraska v. Michals*, 230 Neb. 753, 433 N.W.2d 505 (1988) (settlement agreement is subject to general principles of contract law). Sandra's application which began this litigation is for "Declaratory Relief," and her prayer asks the court to declare that at no time did the estate pay her $144,000 and to order that Rena file an amended Form 1099 showing "$0 paid." Thus, this matter is in the nature of a declaratory judgment action under Neb. Rev. Stat. § 25-21,150 (Reissue 1995), which provides, "Any person interested under a . . . written contract . . . may have determined any question of

construction . . . and obtain a declaration of rights, status or other legal relations thereunder."

In order to grant declaratory relief, there must be a justiciable issue, meaning a present, substantial controversy between parties having adverse legal interests susceptible to immediate resolution and capable of present judicial enforcement. See *Koenig v. Southeast Community College*, 231 Neb. 923, 438 N.W.2d 791 (1989). See, also, *Ellis v. County of Scotts Bluff*, 210 Neb. 495, 315 N.W.2d 451 (1982). "While not a constitutional prerequisite for jurisdiction of courts of the State of Nebraska (cf. U.S. Const. art. III, § 2), existence of an actual case or controversy, nevertheless, is necessary for the exercise of judicial power in Nebraska." *Mullendore v. Nuernberger*, 230 Neb. 921, 925, 434 N.W.2d 511, 515 (1989). In the context of a standing inquiry in a declaratory judgment action involving classification of school districts, the Nebraska Supreme Court held that in order to maintain an action to enforce private rights, the plaintiff must show that he will be benefited by the relief to be granted. *Stahmer v. March*, 202 Neb. 281, 275 N.W.2d 64 (1979) (residents and taxpayers of Class V school district failed to demonstrate how they would benefit from declaration that one or more laws applicable to Class I school districts were invalid, and thus, sustainment of demurrers for lack of standing in declaratory judgment action was affirmed). The Nebraska Supreme Court has said numerous times that it can declare the law and its application to a given set of facts only when a justiciable controversy is presented for determination and that it is not empowered to render advisory opinions. See, *State ex rel. Nebraska Nurses Assn. v. State Board of Nursing*, 205 Neb. 792, 290 N.W.2d 453 (1980); *American Fed. of S., C. & M. Emp. v. State*, 200 Neb. 171, 263 N.W.2d 643 (1978). Similarly, neither we nor the Douglas County Court can render advisory opinions.

## RESOLUTION

The bill of exceptions, aside from the documentary exhibits admitted in evidence, contains 102 pages of discussion between the trial judge, the lawyers for Sandra and Rena, and someone often referred to as "UNIDENTIFIED VOICE," who apparently was a representative of the Douglas County Attorney's office who

was concerned about the county inheritance tax implications of Sandra's request for declaratory relief. And while, in the course of those 102 pages, the question of the propriety of the inheritance tax determination was discussed at some length, the county court made no order concerning such propriety; Douglas County is not a party to this appeal, and thus, no inheritance tax issue is before us. Additionally, we note that Rena did not ask for any affirmative relief, nor seek summary judgment, merely maintaining the position that the Form 1099 was correct. However, Rena alleged in her responsive pleading: "The Douglas County Court does not have jurisdiction to determine whether, according to Federal Tax Laws, [the $144,000] distribution is taxable alimony to [Sandra] or not."

To determine whether there was a justiciable issue and whether the county court had jurisdiction, the crucial questions are as follows: (1) Is there a present substantial controversy between parties with adverse interests, (2) is such controversy susceptible of immediate resolution and judicial enforcement, (3) will Sandra be benefited by the relief to be granted, and (4) is the court's decision merely an advisory opinion?

The answer to all of these questions becomes apparent when the true nature of the "dispute" is recognized: whether the $144,000 distribution is taxable income in the eyes of the IRS. The Form 1099 is merely a piece of paper, and its contents do not determine whether the $144,000 amount is includable in Sandra's gross income for federal income tax purposes. Thus, whether the Form 1099 says that Sandra received $0 or $144,000 from the estate is not a substantial controversy. Moreover, since Rena as the personal representative has nothing at stake as to whether Sandra pays income tax on the money, Rena as the personal representative has no interest adverse to Sandra's. The real issue presented is not subject to judicial enforcement by the Douglas County Court, because the law is quite clear that state courts' pronouncements on the nature of a payment are not binding on the IRS' treatment of money under I.R.C. § 71 (2000). Thus, it naturally follows that an order from a Nebraska state court as to what should be written in the boxes on a Form 1099 is of no benefit to Sandra. It also follows that such an order is merely advisory and does not resolve the issue which concerns

Sandra. The long and short of it is that Sandra's "fight" about the taxability of the $144,000 is not with the personal representative of her former husband's estate, but with the IRS. And, while some of the evidence involved here—such as Sandra's property settlement agreement with Thomas and the terms of the resolution of the federal court interpleader action—will clearly be important in the ultimate determination of this issue, the forum for such determination is not the Douglas County Court; it will be resolved in another forum. As an aside, we recall that the IRS tax specialist, Munsterman, said that the Form 1099 was properly issued by Rena as the personal representative.

Because there was no justiciable issue presented by Sandra, the county court should not have attempted to exercise its judicial power, and it lacked subject matter jurisdiction. Therefore, the county court's order of May 18, 2004, is vacated and this appeal is dismissed. See *State v. Rieger*, 257 Neb. 826, 600 N.W.2d 831 (1999) (appellate court has power to vacate order entered by lower court without jurisdiction).

VACATED AND DISMISSED.