[Cite as *Albers v. Albers*, 2013-Ohio-2352.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

CYNTHIA K. ALBERS                    :

     Plaintiff-Appellee              :           C.A. CASE NO.    2012 CA 41

v.                                   :           T.C. NO.    10DR206

HENRY W. ALBERS                      :           (Civil appeal from Common
                                                 Pleas Court, Domestic Relations)

     Defendant-Appellant             :

                                     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____7th____ day of ____June____, 2013.

. . . . . . . . . .

ELIZABETH J. HENLEY, Atty. Reg. No. 0034207, Talbott Tower, Suite 1205, 131 N. Ludlow Street, Dayton, Ohio 45402
     Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 2661 Commons Blvd., Suite 214, Beavercreek, Ohio 45431
     Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

     **{¶ 1}** Henry W. Albers appeals from a Final Judgment and Decree of

Divorce of the Greene County Court of Common Pleas, Domestic Relations Division, which granted Cynthia Albers's complaint for divorce and determined issues related to property division, spousal support, and child support. For the reasons that follow, the judgment of the trial court will be reversed in part, affirmed in part, and remanded for further proceedings.

{¶ 2}    Cynthia and Henry Albers were married in 1988, and they had three daughters. Mrs. Albers filed a complaint for divorce in June 2010, in the wake of accusations that Mr. Albers had sexually abused one of their children. Dr. Albers was subsequently charged with numerous criminal offenses; in 2011, he was convicted on two counts of sexual battery and one count of gross sexual imposition. He also lost his license to practice medicine.

{¶ 3}    In the divorce decree, the trial court awarded the majority of the parties' assets to Mrs. Albers. It reasoned that Mr. Albers had lost his medical license and income and had been sentenced to prison due to his own voluntary criminal conduct and that he therefore was voluntarily underemployed. It further held that the children and Mrs. Albers were entitled to child support and spousal support, respectively, during Mr. Albers's incarceration, based on the amount he was earning prior to his criminal conduct.

{¶ 4}    The trial court awarded child support of $2,907.26 per month, for 30 months, a period which the trial court believed to correspond to Mr. Albers's imprisonment,[1] for a total of $87,217.80 over 30 months. This amount was to be paid by Mr. Albers in a lump sum to a trust administered by the guardian ad litem from assets Mr. Albers possessed

---

[1] Mr. Albers was actually sentenced to an aggregate term of two years.

at the time of the divorce; periodic payments were to be made from the trust as child support. The court also awarded spousal support of $7,830 per month for 30 months and retained jurisdiction over spousal support for 15 years. After dividing the marital assets, the court ordered that a substantial portion of Mr. Albers's assets be paid to Mrs. Albers or to the child support trust to cover support payments during his incarceration, because he had no other means to pay the amounts awarded. The trial court made various other orders related to the division of bank accounts, including college savings accounts and health savings accounts, the allocation of marital debt, and tax exemptions.

{¶ 5} The court's judgment did not provide for child support or spousal support beyond the period of Mr. Albers's presumed incarceration, although it retained jurisdiction over these issues.

{¶ 6} The court's Decision and Order to Prepare Final Decree and its Final Judgment and Decree of Divorce state that Mr. Albers "lost his job" as a result of his criminal acts, but do not specifically discuss the status of his medical license. Likewise, in their briefs, both parties state that Mr. Albers "lost his license," but it is unclear whether his license was suspended or revoked, and whether there will be any possibility for Mr. Albers to regain his license when he gets out of prison. Thus, his potential for future earnings is unclear from the record on appeal. Although the initial length and amount of spousal support and child support were calculated based on his anticipated time in prison, his child support and spousal support may continue beyond the 30-month period. The trial court may intend to revisit these issues when Mr. Albers is released from prison and the parties' employment opportunities, if any, become more clear.

**{¶ 7}** Mr. Albers appeals from the trial court's judgment, raising ten assignments of error.

**{¶ 8}** As a preliminary matter, Mr. Albers contends that the trial court did not provide an opportunity for a full hearing on the contested issues. In his brief, he states that his attorney "frantically" attempted to place important matters into the record at the end of the "brief" hearing on September 26, 2011, and claims that he was denied an opportunity to present his own testimony on the issue of financial misconduct. He asserts that he was not aware at the time of the hearing that the court intended for it to be the "final" hearing and that his attorney only learned that there would be no further hearing in a subsequent phone call.

**{¶ 9}** The record does not support Mr. Albers's assertions that he was unaware of the nature of the hearing. At the beginning of the hearing, the trial court stated that the matter was before the court for a "final hearing" on the complaint for divorce. There was no suggestion in the record that an additional hearing would be conducted. Mr. Albers did not object to the court's characterization of the hearing as a "final hearing," and it is not apparent from the hearing transcript that there were additional matters about which he expected to be allowed to present evidence. Mr. Albers's argument that he was denied a full hearing is without merit.

**{¶ 10}** The court did make several comments that it was "running short on time," and it limited testimony about the amounts held in and withdrawn from the parties' joint American Funds account at various times in the course of the divorce. Instead, the court asked to be told the amount in the account as of the hearing date and asked Mrs. Albers's

counsel to provide specific amounts attributable to various uses of the account after the hearing through exhibits. These limitations on the evidence presented will be discussed under the sixth assignment of error.

{¶ 11} Mr. Albers asserts in his brief that he wanted to present evidence that he had not engaged in financial misconduct, "but was denied." But when Mr. Albers proposed offering such testimony, the court stated, "Is there an allegation that he did that [engaged in financial misconduct]?," and Mrs. Albers's attorney stated that there was no such allegation. The court then stated: "My understanding is * * * that the income situation was affected by his criminal charge and conviction and the allegations * * * before the criminal charge, that's what led to * * * his termination. * * * Neither party went out and gambled away the money, spent it on trip to Aruba or something." Mr. Albers's attorney did not object to this apparent stipulation to the absence of "financial misconduct" and did not press the issue of presenting additional evidence on this issue. In light of the record, including Mrs. Albers's agreement that there was no financial misconduct, there is no basis to conclude that Mr. Albers sought or needed to present additional evidence on this issue.

{¶ 12} We now turn to Mr. Albers's ten assignments of error.

{¶ 13} Mr. Albers's first assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT HELD MR.

ALBERS ENGAGED IN FINANCIAL MISCONDUCT.

{¶ 14} Mr. Albers contends that the trial court abused its discretion in concluding that he had engaged in financial misconduct after the parties agreed, at the hearing, that neither party had "dissipate[d], destroy[ed], conceal[ed], or fraudulently dispose[d] of any

marital assets."[2]  He also asserts that the trial court erred in concluding, as a matter of law, that all criminal convictions are "financial misconduct," in that they may have long-term financial consequences on the family.

{¶ 15}   We agree with Mr. Albers that sexual battery and gross sexual imposition are not financial misconduct, as listed by R.C. 3105.171(E)(4) or as stipulated by the parties, although many of the financial consequences of one's imprisonment for these offenses are readily apparent.  As the court stated, the "income situation was affected by his criminal charge and conviction."  The court's remarks did not cite R.C. 3105.171(E)(4) and, in our view, the trial court's characterization of Mr. Albers's conduct as financial misconduct was not determinative.

{¶ 16}   For the most part, there is no dispute in this case as to what constituted marital property.  It is well-settled that the starting point of a trial court's analysis in the division of marital property in a divorce is a potentially equal division of assets, unless an equal division would be inequitable.  R.C. 3105.171(C)(1); *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981), paragraph one of the syllabus; *Quigley v. Quigley*, 6th Dist. Lucas No. L-03-1115, 2004-Ohio-2464, ¶ 70.   A court shall consider a wide variety of factors, including those set forth at R.C. 3105.171(F), in determining what is equitable, and its division of marital property will not be reversed absent a finding that the court abused its discretion.  *Cherry* at 353, 355 ("[T]he mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion."); *Martin v. Martin*, 18 Ohio St.3d

---

[2]The brief refers to R.C. 3105.17, but   Mr. Albers's argument is based on the definition of financial misconduct found at R.C. 3105.171(E)(4).

292, 294, 480 N.E.2d 1112 (1985).

{¶ 17}   Numerous courts have held that criminal conduct by one of the parties to a divorce can be considered in making an equitable distribution of marital assets, because of the financial ramifications that such conduct frequently creates for the spouse.   In *Leadingham v. Leadingham*, 120 Ohio App.3d 496, 698 N.E.2d 465 (12th Dist.1997), a case relied upon by the trial court, the Twelfth Appellate District concluded that a trial court's consideration of the husband's conviction for possession of cocaine in its division of marital assets was not improper; "[Husband] may not have intended to lose his job and the chance to accrue full pension benefits, but his misconduct was intentional, voluntary, and foreseeably led to that result."   *Id*. at 499.

{¶ 18}   In *Taylor v. Taylor*, 2d Dist. Montgomery No. 17727, 1999 WL 1043934 (Nov. 19, 1999), we held that the trial court did not abuse its discretion in awarding nearly all of a couple's marital assets to the wife, after a 47-year marriage, where she had "very little means" to support herself and the husband had been convicted of aggravated murder, resulting in the loss of his employment and his incarceration for the rest of his life.   In *Quigley*, the Sixth Appellate District held that the trial court had not abused its discretion in awarding a disproportionate share of marital assets to the wife, on the basis that the husband's criminal conduct (which included an attempt to have the wife killed) and his subsequent imprisonment made the award of spousal support, to which she would have otherwise been entitled, "neither feasible nor practical."   *Quigley* at ¶ 86-87. *See also Dragojevic-Wiczen v. Wiczen*, 101 Ohio App.3d 152, 655 N.E.2d 222 (11th Dist.1995).

{¶ 19}   All of these cases found that it was equitable, under the circumstances

presented, to award one spouse more than half of the marital assets, because the other spouse's criminal activity had eliminated or significantly reduced his earnings and his ability to pay spousal support and/or had necessitated the expenditure of significant marital assets on criminal defense. None of these cases relied on a finding of "financial misconduct," as discussed in R.C. 3105.171(E)(4).

{¶ 20} Although the trial court found that Mr. Albers's "voluntary criminal acts" constituted "financial misconduct," a review of its Decision and Entry and of its Final Judgment and Decree of Divorce establishes that its conclusions were based on the effects of criminal conduct and general principles of equity. Specifically, the court said that the "only equitable solution" was a distributive award to compensate Mrs. Albers for the family's economic hardship. It stated that Mr. Albers's "current incarceration is a result arising from his voluntary, intentional, and criminal acts," and that his "conduct created the adverse financial consequences that will continue to impact this family, the children's emotional well being, their lifestyle, and their social standing within their community for years to come." It also concluded that Mrs. Albers "needs an additional award of marital assets to compensate her for [Mr. Albers's] inability, due to his voluntary, intentional, criminal acts, to pay periodic child support out of earned income for the three minor children or to pay periodic spousal support out of earned income."

{¶ 21} The court did not hold that all criminal convictions (i.e., regardless of the nature of the offense, the length and type of penalty involved, and their effect on the ability to earn income now or in the future) constitute "financial misconduct." Although the trial court and the parties used the term "financial misconduct" too broadly, the court's

conclusions were nonetheless valid. The court did not abuse its discretion in concluding that Mrs. Albers was entitled to a larger share (more than half) of the marital assets for equitable reasons.

{¶ 22} The first assignment of error is overruled.

{¶ 23} Mr. Albers's second assignment of error states:

THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN ITS CALCULATION AS TO DURATION AND LUMP SUM PAYMENTS OF MR. ALBERS'S CHILD SUPPORT OBLIGATION.

{¶ 24} Mr. Albers claims that the trial court imputed too much income to him for the purpose of calculating child support, without making the necessary finding that he was unemployed or underemployed, erred in awarding a "lump sum" child support payment, and did not properly account for the anticipated emancipation of two of the children.

{¶ 25} The trial court found that Mr. Albers was "physically and mentally healthy" and able to work, had a medical license, and had been "fully employed" until he "voluntarily committed criminal acts of a sexual nature against a minor child." It also found that Mr. Albers's incarceration for these voluntary acts did not relieve him of his duty to support his children. The court concluded that Mr. Albers's "willful, intentional, criminal acts constitute voluntary underemployment."

{¶ 26} Voluntary unemployment or underemployment does not warrant a downward modification of a child support obligation. *Kreuzer v. Kreuzer*, 2d Dist. Greene No. 00CA43, 2001 WL 468406 ,* 3 (May 4, 2001), citing *Woloch v. Foster*, 98 Ohio App.3d 806, 649 N.E.2d 918 (2d Dist.1994). Incarceration may or may not warrant a modification, depending on the

circumstances involved, but we and many Ohio courts have found incarceration due to criminal conduct to be voluntary. *See, e.g., L.B. v. T.B.,* 2d Dist Montgomery No. 24441, 2011-Ohio-3418, ¶ 16; *Richardson v. Ballard*, 113 Ohio App.3d 552, 554, 681 N.E.2d 507 (12th Dist.1996); *Brockmeier v. Brockmeier*, 91 Ohio App.3d 689, 693, 633 N.E.2d 584 (1st Dist.1993); *Cole v. Cole*, 70 Ohio App.3d 188, 194, 590 N.E.2d 862 (6th Dist.1990). Whether a parent is voluntarily unemployed or underemployed is a fact-sensitive determination that is committed to the trial court's sound discretion. *Fischer v. Fischer*, 2d Dist Clark No. 11 CA 81, 2012-Ohio-2102, ¶ 19, citing *Combs v. Combs*, 12th Dist. Warren No. CA2001-11-102, 2003-Ohio-198.

**{¶ 27}** Mr. Albers asserts in his brief that the trial court "made no finding that [he] was voluntarily underemployed;" however, in its Decision and Order, the court expressly stated that Mr. Albers's "willful, intentional, criminal acts" caused him to lose his employment and "constitute[d] voluntary underemployment."

**{¶ 28}** Mr. Albers also asserts that the trial court abused its discretion in imputing income to him based on his prior employment, because it did not expressly consider the factors set forth in R.C. 3119.01(C)(11), and such income was unrealistic in light of the loss of his medical license. The court imputed income of $426,405 per year, based on a four-year average of Mr. Albers's income before losing his medical license.

**{¶ 29}** Pursuant to R.C. 3119.01(C)(11), "potential income" means both imputed earned income and imputed income from nonincome-producing assets for a parent who the court determines is voluntarily unemployed or voluntarily underemployed. The following criteria are instructive in determining imputed earned income: 1) the parent's prior employment experience;

2) the parent's education; 3) the parent's physical and mental disabilities, if any; 4) the availability of employment in the geographic area in which the parent resides; 5) the prevailing wage and salary levels in the geographic area in which the parent resides; 6) the parent's special skills and training; 7) whether there is evidence that the parent has the ability to earn the imputed income; 8) the age and special needs of the child for whom child support is being calculated under this section; 9) the parent's increased earning capacity because of experience; 10) the parent's decreased earning capacity because of a felony conviction; and 11) any other relevant factor. *Id.*

{¶ 30}  Although the trial court did not specifically refer to the statutory factors, it did discuss many of them.  The court stated that Mr. Albers had been a pediatric orthopedic surgeon, with a medical license and the "education needed to maintain the license," that he was "physically and mentally healthy," and that he had been "fully employed" in the Miami Valley, earning an average of $426,405 per year over four years before his criminal acts were discovered.  These observations reflect the trial court's consideration of many of the factors set forth in R.C. 3119.01(C)(11).  It is apparent that the trial court viewed the financial effect of Mr. Albers's criminal conduct as another relevant factor.

{¶ 31}  The trial court's award of a "lump sum" of child support, which was effectuated through the distribution of marital assets to a trust administered by the guardian ad litem, was designed to cover the child support that Mr. Albers would have been ordered to pay during his incarceration.[3]  The court has continuing jurisdiction over child support, and could revisit the

---

[3] As noted above, the trial court apparently believed that Mr. Albers would be incarcerated for 30 months, but his actual sentence was for two years.

issue when Mr. Albers is released from prison, for any children who are not yet emancipated at that time.

**{¶ 32}** Mr. Albers relies on *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, in support of his argument that a trial court abuses its discretion in making a lump sum child support order. In *Feldmiller*, the court awarded a lump sum child support payment "on a somewhat distributive award theory," where the non-residential parent (the father) had been terminated from his employment for cause and a non-solicitation agreement with his former employer significantly diminished his prospect for comparable employment and/or income in the near future. We held that the trial court in that case abused its discretion when it ordered a lump sum child support payment instead of periodic monthly payments of the amount due, because it did not set forth specific facts in support of a lump sum payment. *Id.* at ¶ 53. Although we expressed some doubt as to whether R.C. Chapter 3119 allows orders for lump sum payments of child support, we did not decide this issue.

**{¶ 33}** As in *Feldmiller*, Mr. Albers's argument focuses on the trial court's failure to make factual findings to support its lump sum award, although his assignment of error is stated more broadly.

**{¶ 34}** Mr. Albers claims that, because he could have established his own account – like the guardian ad litem's account – from which child support payments could periodically be paid, the trial court abused its discretion in ordering that a lump sum be paid to the guardian ad litem's IOLTA account for this purpose. Mr. Albers does not dispute that the only realistic means by which child support could be paid while he was imprisoned was by setting aside assets already in his possession. In our view, there is no legally significant distinction between these

methods of payment; under either scenario, assets were held in reserve for the payment of child support, not paid in one, irrevocable lump sum. Considering the alienation and distrust between the parties, the trial court did not abuse its discretion in concluding that the guardian ad litem, rather than Mr. Albers, should hold the funds from which his child support obligation would be paid while he was in prison.

{¶ 35} Finally, Mr. Albers argues that the amount set aside for child support payments did not account for the fact that two of the children may be emancipated during the 30-month period for which child support was ordered. It is clear from the trial court's order that it calculated the lump sum to be reserved for child support payments based on three children at a rate of $2,907.26 per month for 30 months ($2,907.26 x 30 months = $87,217.80). This order was entered on May 22, 2012. Mr. Albers points out in his brief that his oldest daughter celebrated her 18th birthday on April 1, 2012 (prior to the court's judgment), and that his second daughter will reach the age of majority on July 24, 2014. Thus, he argues that two of the girls might be emancipated within the 30-month period for which money was set aside to pay child support.

{¶ 36} A child is not automatically emancipated at age 18; additional factors such as the completion of high school and any special circumstances of a particular child can also come into play. R.C. 3119.86(A). Mr. Albers does not discuss these other issues, and it is not clear from the record when, in fact, the oldest daughters were or will be emancipated. Because the funds are held in trust for the periodic payment of the child support, we presume that the payments are subject to further order of the court. Thus, Mr. Albers may be able to file a motion to modify his child support obligation when all of the conditions are (were) satisfied for the

emancipation of any child.

{¶ 37}  The trust fund is structured to assure the availability of funds to pay Mr. Albers's child support obligation, but it does not constitute a windfall to Mrs. Albers, as Mr. Albers suggests.  In calculating Mr. Albers's potential support obligation, the trial court was not obligated to presume that Mr. Albers's support obligation would cease on the children's eighteenth birthdays.  If funds remain in the trust account after Mr. Albers's child support obligations have been satisfied for 30 months, or when any child is emancipated, the trial court may, in its discretion, return any excess funds to Mr. Albers or apply those funds to the support of another child who is not yet emancipated.

{¶ 38}  The second assignment of error is overruled.

{¶ 39}  Mr. Albers's third assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION [IN] THAT PNC BANK ACCOUNTS AND AMERICAN FUNDS 529 ACCOUNTS WERE NOT [TREATED AS] MARITAL PROPERTY.

{¶ 40}  Mr. Albers contends that the trial court had no basis for treating the Alberses' three savings accounts at PNC and three 529 college savings accounts[4] with American Funds, each of which named one of the three daughters, as non-marital property.  He claims that he and/or Mrs. Albers established these accounts and that all of the funds contributed to these accounts came from his income.  Thus, he contends that the accounts should have been treated as marital assets.  The court described the PNC savings accounts as "college funds" and awarded

---

[4] 529 Plans, also known as 529 College Savings Accounts, are so named because they are permitted under Section 529 of the Internal Revenue Code, 26 U.S.C. 529.

them to the children. It also awarded the American Fund 529 accounts to the children.

{¶ 41} At the hearing, the trial court stated that there was no disagreement that the three 529 accounts with American Funds were "custodial accounts," but asked, "[A]re we considering them property of the two parties, marital property, for division purposes?" Mrs. Albers and her attorney answered affirmatively. With respect to the three PNC savings accounts, "one for each of the girls," the court again asked whether the parties intended to "leave those for the children to use for college" or "split those." The parties disagreed about how to handle those accounts, with Mrs. Albers asserting that they should be used for college and Mr. Albers stating that "[w]e can't afford to do that * * * at this juncture. * * * [W]e need to count those as marital assets."

{¶ 42} Pursuant to R.C. 3105.171(B), a court must divide marital property equitably between the parties. There is no provision in R.C. 3105.171 for awarding marital property to third parties, including the parties' children. In light of the facts before us and Mrs. Albers's agreement at trial that the American Fund 529 accounts were marital property, the trial court abused its discretion in awarding those accounts directly to the children.

{¶ 43} Based on the evidence before the court, there also was no basis for the court to conclude that the PNC accounts were not marital property. Although the parties seem to have initially intended for these savings accounts to help their daughters pay for college, the accounts were regular savings accounts, not 529 accounts. There was no dispute that the funds in those accounts came from Mr. Albers's income. There is no dispute that the accounts contained marital funds and, as such, there was no legal basis for the trial court to award those marital funds to the daughters, even if the parties originally intended for the funds to benefit the daughters.

{¶ 44} Mr. Albers's third assignment of error is sustained. We will remand for the

trial court to distribute these marital assets to one or both of the parties in an equitable manner.

**{¶ 45}** Mr. Albers's fourth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GIVE MR.

ALBERS CREDIT FOR REDUCING MARITAL DEBT.

**{¶ 46}** Mr. Albers claims that the trial court abused its discretion in failing to credit him with reducing marital debt. At the hearing, Mr. Albers testified that he had paid $20,400 to pay off the couple's L.L.Bean credit card; Mrs. Albers's attorney asserted that she had also paid $2,000 toward this debt. Neither of these claims was documented or refuted. The source(s) of the monies the parties used to pay the debt was not discussed. In its decision, the trial court simply concluded that "the L.L.Bean credit card has been paid in full and there is no marital debt." Mr. Albers claims that he should have been credited $10,200 (half of the amount that he paid), without addressing the $2,000 that Mrs. Albers paid.

**{¶ 47}** Because the source of the funds used by Mr. Albers to pay the debt is unclear, we cannot conclude that the trial court abused its discretion in failing to credit him. The only sources of income that Mr. Albers identified after the loss of his medical license in June 2010 were payments of accounts receivable for services provided before the loss of his license and interest on existing assets. These funds were presumably marital assets, since the services were rendered or the assets were accrued during the marriage. Moreover, Mr. Albers stated in a Motion in Opposition to Reimbursement, filed in April 2012, that he paid off the L.L.Bean account using a portion of nearly $100,000 that was released to him from a marital account in October 2011. The trial court could have reasonably concluded that the L.L.Bean payments were made from marital assets and that neither party was entitled to credit for these payments.

{¶ 48} The fourth assignment of error is overruled.

{¶ 49} Mr. Albers's fifth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING SPOUSAL

SUPPORT IN A LUMP SUM.

{¶ 50} Mr. Albers claims that the amount of spousal support awarded was against the manifest weight of the evidence, that the award improperly penalized him for his alleged misconduct, and that, at the very least, the court should have allowed him to take a tax deduction for the amount paid in spousal support. The court awarded spousal support of $7,830 per month for 30 months, or a total award for the first 30 months of $234,900, and it retained jurisdiction over spousal support for 15 years. In other words, it awarded spousal support of $93,960 per year for the first two and one-half years, based on Mr. Albers's prior average income of $426,405 per year.

{¶ 51} Although Mr. Albers's statement of this assignment of error suggests that he objects to the lump sum nature of the spousal support award, his argument focuses on the amount of the award. He claims that the record "rebuts" the usual presumption that the trial court considered the statutory factors set forth at R.C. 3105.18(C) and that the award, which was based on his income before his criminal conviction, was "speculative" and punitive.

{¶ 52} The record refutes Mr. Albers's assertion that the trial court did not consider the statutory factors. Several of those factors were discussed at the hearing, including the relative earning abilities of the parties (before Mr. Albers's conviction), the length of the marriage, the parties' standard of living during the marriage, and their relative educations. Mrs. Albers had not been employed outside the home throughout most of the marriage, had never finished a college degree due to several moves in furtherance of Mr. Albers's career, and had not worked

outside the home for 15 years. The Albers children were home-schooled by Mrs. Albers.

{¶ 53}   R.C. 3105.18(C)(1)(n) also permits the court to consider any other factor that it finds to be relevant; the trial court clearly concluded that Mr. Albers's misconduct, which significantly restricted his future earning capacity and rendered him underemployed during his incarceration, was such a relevant factor.  If Mr. Albers had remained employed at his prior position and income at the time of the divorce, Mrs. Albers would likely have received significant spousal support for an extended period of time.  Under the circumstances presented, however, the trial court awarded spousal support for a short period of time based on Mr. Albers's prior income, and retained jurisdiction over spousal support for 15 years.  Given the considerable uncertainty about Mr. Albers's earning capacity when he is released from prison, this course was not unreasonable.  We cannot conclude that the court abused its discretion in fashioning the spousal support award, or in ordering that the award for an initial period of 30 months be paid from the marital assets available at the time of the divorce.

{¶ 54}   Mr. Albers also contends that the trial court erred in stating that his spousal support payments would not be deductible for tax purposes.  In its Decision and Order, from which the Final Decree was to be prepared, the court stated that "[t]he spousal support is non-taxable to [Mrs. Albers] and non-deductible to [Mr. Albers]."

{¶ 55}   Although he does not cite to any authority, Mr. Albers correctly points out that the tax code generally provides that spousal support paid pursuant to a divorce decree may be deducted by the payor and will be treated as ordinary income to the payee.  26 U.S.C. 215(a). *See also Ornelas v. Ornelas*, 12th Dist. Warren No. CA2011-08-094, 2012-Ohio-4106, 978 N.E.2d 946, ¶ 33.  Neither the trial court nor Mrs. Albers has cited any authority for the

proposition that the trial court has jurisdiction to alter this treatment of such payments. [5] However, the provision about which Mr. Albers complains is not contained the trial court's Final Decree. Therefore, he suffered no prejudice as a result of the trial court's earlier statement.

**{¶ 56}** The fifth assignment of error is overruled.

**{¶ 57}** Mr. Albers's sixth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO HEAR EVIDENCE ON A MARITAL CHECKING ACCOUNT AND EQUITABLY DIVIDE THIS ACCOUNT.

**{¶ 58}** Mr. Albers contends that the trial court erred in concluding that Mrs. Albers was entitled to $11,757.50, representing half of an amount ($23,515) that was paid to him while the divorce was pending out of a marital account with American Funds. It is unclear when this payment was made to Mr. Albers.

---

[5] One of the purposes intended by Congress in initially enacting the provision making alimony and separate maintenance payments includable in gross income for federal tax purposes was that there would be uniformity of tax treatment in the various states. *Bardwell v. C.I.R.*, 318 F.2d 786, 789 (10th Cir.1963). In light of this intention and general principles of federalism, courts have questioned whether a state trial court has the authority to dictate how spousal support payments will be treated under federal law. *See United States v. Mitchell*, 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971), quoting *Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199 (1932) ("The state law creates legal interests but federal statute determines when and how they shall be taxed."); *Bardwell* (It is a "longstanding principle having its roots in basic precepts of federalism" that "state law is not binding on federal courts in determining income tax questions."); *In re Estate of Tizzard*, 14 Neb. App. 326, 708 N.W.2d 277 ("The determination of whether a person owes federal income tax on money received does not occur in the * * * state courts.").

{¶ 59}   The evidence about the disposition of the American Funds account is incomplete and difficult to decipher on this record.   The value of the account as of March 2011[6] was $187,780.   This total included the funds that had been deposited into 529 accounts for the Albers daughters, but the amounts contained in the daughters' accounts were not established.  Because the court was "running short on time," it asked counsel for Mrs. Albers to provide the breakdown of the daughters' accounts via an exhibit; if counsel did so, the exhibit is not contained in the record, and it is unclear whether Mr. Albers was provided an opportunity to review or respond to any numbers provided by Mrs. Albers.

{¶ 60}   In his brief, Mr. Albers suggests that the amount contained in the daughters' three 529 accounts totaled $168,322.   The record contains no evidence to substantiate this amount.   Assuming, for the sake of argument, that Mr. Albers's number were correct, the balance of the American Funds account would have been $19,458.   Allowing for fluctuations in the market, this number ($19,458) is in the ballpark of the amount allegedly distributed to Mr. Albers ($23,515).   But this calculation is speculative.   More importantly, the evidence is simply insufficient for us to determine the reason for the original payment to Mr. Albers or the reasonableness of the order requiring him to repay half of the money to Mrs. Albers.   Mr. Albers claims in his brief that the $23,515 that was distributed to him from the account was intended as a "partial offset" of "nearly" $100,000 that was transferred from "the parties['] marital checking and savings account into [Mrs. Albers's] personal account" days after the complaint for divorce was filed.   However, there was no evidence presented about other checking or savings accounts, and neither the trial court's Decision and Entry nor its Final Order addressed any transfers of

---

[6] The relevance of this date is unclear, and the parties agree that the amount in the account fluctuated.

funds into Mrs. Albers's accounts around the time of the filing of the complaint.

{¶ 61} Generally, we are reluctant to address an alleged error in the division of assets about which evidence was not developed at the hearing; Mrs. Albers urges us not to address this particular argument, because "how and why" Mr. Albers received the $23,515 from the American Funds account "is not in the record." However, several factors contribute to our reluctance to presume the correctness of the trial court's order for partial repayment of funds from this account, including: 1) no evidence was presented about the total amount in the account as of the date of distribution, 2) no amounts were attributed to any of the other claims against the account (e.g., the daughters' 529 accounts), 3) no explanations or specifics were provided about transfers to the parties from this account or other accounts during the pendency of the divorce, 4) the trial court may have relied on exhibits provided after the hearing which are not contained in the record; and 5) it is not clear that Mr. Albers was provided with these documents or had an opportunity to respond to them. Moreover, the trial court refused to hear detailed arguments about the amounts in the accounts or other prior distributions from the accounts at the time of the hearing; the court expressed an interest in knowing only what was in the accounts as of "right now * * * at quarter till four on Monday, the 26th of September," although Mr. Albers's attorney attempted to discuss a "tricky" issue about "a lot of money" that had been in the accounts at one time.

{¶ 62} We are unable to determine whether the trial court abused its discretion in ordering Mr. Albers to repay half of the amount he withdrew, because the record before us does not support a detailed calculation or reflect a complete picture of the amounts and purposes for which funds were withdrawn from the account by either party during the divorce proceedings. Thus, we will remand for further development of such evidence and/or for the court to more fully

explain how the funds from this account will be distributed and its reasons for doing so.

{¶ 63}  The sixth assignment of error is sustained.

{¶ 64}  Mr. Albers's seventh assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO EQUITABLY DIVIDE THE FIFTH THIRD HEALTH SAVINGS ACCOUNT.

{¶ 65}  The parties had a health savings account with Fifth Third Bank for the benefit of all the family members.  During the first half of 2010, before Mr. Albers lost his employment, $6,181 was deposited into this account; it was "frozen" during the divorce proceedings, and Mrs. Albers incurred $1,500 - $2,000 in medical expenses for the children during this time.  Mr. Albers asserts that the trial court erred in failing "to equitabl[y] divid[e] this marital asset" in the divorce.

{¶ 66}  We infer from the parties' briefs that the trial court awarded the total balance in the HSA account to Mrs. Albers to be used for her health expenses and those of the children. She contends that such a distribution was appropriate because "four out of five members of the Albers family reside with Mrs. Albers."  However, neither the trial court's March 2012 Decision and Entry nor its Final Judgment and Decree of Divorce addresses the disposition of this account.  When the matter was addressed at the hearing, the trial court did not resolve the issue, so there is no record of its reason for awarding the entire account to Mrs. Albers.

{¶ 67}  We are unclear about the trial court's failure to include this item in its judgment. The parties agree about the manner in which the trial court disposed of the account, although Mr. Albers contends that the trial court abused its discretion in disposing of it as the court did. However, a court speaks through its judgment, and the disposition of the health savings account

is not addressed in the final entry and decree of divorce. Thus, this issue is not properly before us for appellate review. If it were, we would find no abuse of discretion in the trial court's award of the health savings account for the use of Mrs. Albers and the Albers daughters. It is logical to assume that those four members of the family will incur the majority of the medical expenses. Also, considering Mr. Albers's imprisonment, it is doubtful he would have any unpaid medical expenses in the short term or whether he would be permitted to access these funds to pay for medical expenses during his imprisonment.

{¶ 68} The seventh assignment of error is overruled, because the alleged error is not contained in the trial court's judgment. On remand, the trial court may, in its discretion, modify its judgment to reflect the disposition of the health savings account.

{¶ 69} Mr. Albers's eighth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THERE ARE MINIMAL TAX CONSEQUENCES ASSOCIATED WITH THE DIVISION OF PENSION BENEFITS AND FINANCIAL ACCOUNTS.

{¶ 70} Mr. Albers objects to the trial court's distribution of liquid and non-liquid assets in the divorce. Mrs. Albers was awarded all of the liquid assets, whereas Mr. Albers retained slightly less than one-half of his retirement account. His argument focuses on the following conclusion in the trial court's Decision and Entry: "There are minimal tax consequences associated with the division of the pension benefits and financial accounts." Mr. Albers asserts that this statement is erroneous because, having no other assets to draw upon when he is released from prison, he will be left to draw upon his retirement account, for which he will incur tax penalties.

**{¶ 71}** As Mrs. Albers points out, no evidence was presented by the parties about liquid versus non-liquid assets or the tax consequences related to the liquidation (if necessary) of non-liquid assets. Likewise, no evidence was presented about Mr. Albers's prospects for employment after he serves his term of imprisonment, although the trial court found that his earning ability was "severely compromised by his felony convictions." Under these circumstances, Mr. Albers's suggestions that 1) he *may* need to liquidate assets when he is released from prison, and 2) in doing so, he *may* sustain adverse tax consequences, are speculative. The trial court clearly placed a higher priority on providing for Mr. Albers's family in the short term than on his means to provide for himself in the longer term. We cannot find that the trial court abused its discretion in prioritizing these matters as it did.

**{¶ 72}** The eighth assignment of error is overruled.

**{¶ 73}** Mr. Albers's ninth assignment of error states:

THE TRIAL COURT ERRED BY HOLDING IT [SIC] APPELLEE LOST INCOME PRODUCING ABILITY DURING THE MARRIAGE AND NEEDS TIME [TO] OBTAIN ADDITIONAL VOCATIONAL SKILLS.

**{¶ 74}** Mr. Albers contends that, in the future, Mrs. Albers should be expected to work, whether by finishing her college degree, returning to reception work, as she had done in the past, or obtaining some other employment. He claims that the trial court erred in stating that "it would be inappropriate for [Mrs. Albers] to work outside the home."

**{¶ 75}** Mr. Albers misconstrues the trial court's statement by quoting only part of a sentence. The trial court stated: "All three children are home schooled and it would be inappropriate for [Mrs. Albers] to work outside of the home." Mr. Albers himself states in his

brief that he "does not contest that while [the two younger children] are being home schooled it would be inappropriate for [Mrs. Albers] to seek employment." Thus, Mr. Albers's view is aligned with that of the trial court There is nothing in the trial court's judgment to suggest that the court held that it would be "inappropriate" for Mrs. Albers to work when the children are finished with school or during the entire 15 years for which it has retained jurisdiction over spousal support.

{¶ 76} The ninth assignment of error is overruled.

{¶ 77} The tenth assignment of error states:

THE TRIAL COURT ERRED AS A MATTER OF LAW, AND ABUSED ITS DISCRETION, IN ALLOWING APPELLEE ENTITLEMENTS TO CLAIM ALL MINOR CHILDREN AS HER DEPENDENTS FOR INCOME TAX PURPOSES.

{¶ 78} Mr. Albers claims that the trial court abused its discretion in specifying that Mrs. Albers "shall be entitled to claim the minor children as her dependents for income tax purposes," considering that she does not work outside the home and that the trial court stated that spousal support be non-taxable income to her. Mrs. Albers responds that the tax exemptions will be unhelpful to Mr. Albers while he is in prison.

{¶ 79} As we discussed under the fifth assignment of error, spousal support is generally taxable income to the recipient, and we are aware of no authority that would permit a trial court to modify this rule. Moreover, the provision about the taxability of spousal support was not included in the trial court's final judgment. As such, the spousal support payments will be treated as income to Mrs. Albers, and therefore the tax exemptions will be of some benefit to her

during Mr. Albers's imprisonment, whereas they would not benefit him during those years. It is impossible to predict, from the evidence before us, whether Mr. and/or Mrs. Albers will be employed or employable by the time Mr. Albers is released from prison. Thus there is no way to foresee who would benefit more from the tax exemptions at that point. Given this uncertainty, we cannot say that the trial court abused its discretion in resolving this issue as it did.

**{¶ 80}** The tenth assignment of error is overruled.

**{¶ 81}** The judgment of the trial court will be reversed with respect to the disposition of the children's 529 and savings accounts, because the trial court lacked authority to distribute that agreed-upon marital asset to the children. The judgment will also be reversed as to the order that Mr. Albers repay half of the funds distributed to him from the marital American Funds account, because we are unable to review the reasonableness of this order based on the evidence contained in the record. On remand, we instruct the trial court to take additional evidence and/or provide a more detailed explanation of how all of the funds contained in American Funds account, including the funds in the 529 accounts, will be distributed, and to state its reasons for the manner of distribution. The trial court may also modify its judgment to reflect the disposition of the health savings account. In all other respects, the judgment of the trial court will be affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

HALL, J., concurring:

**{¶ 82}** I agree completely with the well-reasoned lead opinion. I write separately only to recognize that upon remand, the trial court may want to consider the potential tax consequences of the division, or future disbursement, of the 529 accounts. These are

tax-advantaged accounts that may subject the earnings portion to tax and penalties for a non-qualified withdrawal. See generally IRS Publication 970, for 2012 returns, Chapter 8.

. . . . . . . . . .

Copies mailed to:

Elizabeth J. Henley
Thomas M. Kollin
Hon. Steven L. Hurley